**UNITED STATES, Appellee,**

v.

**Irvin D. WOODS, Defendant, Appellant.**

**United States, Appellee,**

v.

**Kevin B. Lockhart, Defendant, Appellant.**

**Nos. 98–1816, 98–2205.**

United States Court of Appeals, First Circuit.

Heard Jan. 3, 2000.

Decided April 21, 2000.

Juan Ortiz–Lebrón, by appointment of the Court, for appellant Irvin D. Woods.

James Patrick Bardsley, by appointment of the Court, for appellant Kevin B. Lockhart.

Donald C. Lockhart, Assistant United States Attorney, with whom Margaret E. Curran, United States Attorney, and Kenneth P. Madden, Assistant United States Attorney, were on brief, for appellee.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and BOUDIN, Circuit Judge.

TORRUELLA, Chief Judge.

The appellants, Irwin D. Woods and Kevin B. Lockhart, challenge their convictions for attempting and conspiring to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. Woods also challenges his sentence. For the reasons discussed below, we affirm.

### BACKGROUND

Viewed in the light most favorable to the government, a reasonable jury could have found the following facts. *See United States v. Bartelho,* 71 F.3d 436, 438 (1st Cir.1995) (citing *United States v. Robles,* 45 F.3d 1, 2 (1st Cir.1995)).

Based on information provided by a confidential informant, known as Gloria, that people in Massachusetts wanted to purchase a large quantity of cocaine, on February 27, 1997, Detective Freddie Rocha, from the Special Investigations Bureau of the Providence Police Department, made a telephone call to a Massachusetts number and spoke with a person later identified as appellant Woods. Rocha asked Woods if "he was looking for work." Rocha testified that in his experience as a narcotics investigator, "looking for work" is a reference to cocaine. Rocha and Woods then discussed the price that Rocha would charge (without using the word "cocaine"), and they agreed that the price would be $15,000 for each kilogram.

The next morning, Woods paged Rocha, and told him that he would come to Providence later that morning with his "partner." They agreed to meet at a gas station around 11:15 a.m. At about 11:30 a.m., Woods and Lockhart pulled into the gas station, and then followed Rocha to the parking lot of a Days Inn hotel. Woods introduced Lockhart as his "partner Kevin." Together they went to a hotel room where Gloria was waiting for them. Their conversation was recorded by agents in an adjacent room, but the recording contains a large number of inaudible portions. Although the word cocaine cannot be heard on the recording, Rocha testified that cocaine was mentioned during the conversation. They discussed that the price of $15,000 per kilo was under the then-market price in New York of $24,000. Rocha said that he had five kilos available. After further negotiations, it was decided that the appellants would buy two kilograms of cocaine in cash and receive two kilograms on credit. They agreed that Gloria would live at Woods's house until the appellants sold the cocaine to ensure that the debt was repaid.

Woods then asked to "have a sample," but Rocha refused because it was "all wrapped up" and he did not want to "cut it up." Despite this setback, Lockhart told Rocha "I've got thirty, thirty grand in the car right now." He then stated "She [Gloria] can come to town and you'll get your money by the weekend. No problem." He reiterated these assurances several more times and expressed his hope that the transaction would be the first of many deals, boasting that he could handle five kilos a week. Rocha replied that Lockhart could only handle that much if he had a customer base of two hundred. Woods interjected that he had done business on this scale when he worked for "Miguel," before Miguel "got locked up."

Then Lockhart left to get the money from the car. In his absence, Woods told Rocha "Like I told you ... that's my main man. He's my main partner." Woods explained that he worked with Lockhart because he could not come up with the cash on his own. Lockhart was arrested in the elevator on his way back to the room, carrying approximately $30,000 in cash.

On March 20, 1998, following a four-day trial, a jury convicted the appellants of both counts.

## DISCUSSION

### I. APPELLANT WOODS

#### A. Appellate Jurisdiction

The record shows that Woods's Notice of Appeal was untimely because it was filed eleven court days after judgment was entered. As a result, our jurisdiction over Woods's appeal is at issue. *See United States v. Rapoport*, 159 F.3d 1, 3–4 (1st Cir.1998); *United States v. Serrano*, 870 F.2d 1, 11–12 (1st Cir.1989). According to Fed. R.App. P. 4(b), a notice of appeal must be filed "within ten days after the entry of judgment." Judgment was entered on July 1, 1998, so it follows that Woods's notice of appeal had to be filed by July 13, 1998.[1] Even though the docket reflects that the Notice of Appeal was filed on July 14, 1998, the district court stated "timely filed" in an August 25, 1998 margin order.

▮ It is not as obvious to us as it is to the appellee that we cannot infer from the margin order that the district court found "excusable neglect or good cause" to extend the time to file a notice of appeal. Fed. R.App. P. 4(b)(4). In any event, because the merits of the appeal favor the appellee, we will bypass the jurisdictional issue. *See United States v. Stoller*, 78 F.3d 710, 714 (1st Cir.1996) (recognizing "familiar tenet" that court "may forsake the jurisdictional riddle" when the merits will be resolved in favor of the party challenging the court's jurisdiction).[2]

1. The tenth day falls on Saturday, July 11, 1998. Per First Circuit Rule 26(a)(3), the appellant should have filed a notice of appeal by Monday, July 13, 1998.

2. In so doing, we follow *Kelly v. Marcantonio*, 187 F.3d 192, 197 (1st Cir.1999), and *Parella v. Retirement Board of the Rhode Island Employees' Retirement System*, 173 F.3d 46, 53–54 (1st Cir.1999), in construing narrowly the Supreme Court's ban on "hypothetical jurisdiction," *see Steel Co. v. Citizens For a Better Environment*, 523 U.S. 83, 93–94, 118 S.Ct.

#### B. Sixth Amendment Claim

The appellant raises an ineffective assistance of counsel claim based on the grounds that trial counsel: (1) made damaging factual admissions in the opening statement and closing arguments that were not necessary for an effective entrapment defense; (2) advised the appellant to go to trial rather than plead guilty based on flawed reasoning; (3) failed to inform the appellant of a proposed plea agreement; and (4) failed to pursue the safety valve provision in the Sentencing Guidelines. The appellant did not present this argument before the district court.

▮ It is well settled that we will not entertain an ineffective assistance claim on direct appeal "absent a sufficiently developed evidentiary record." *United States v. Ademaj*, 170 F.3d 58, 64 (1st Cir.1999). Because the appellant raises three non-record-based contentions, the proper forum for his ineffective assistance claim is a collateral proceeding under 28 U.S.C. § 2255 where the facts can be fully developed. *See id.* Although the appellant's entrapment-related argument might otherwise be resolved as part of this appeal, we decline to approach his ineffective assistance claim in a piecemeal fashion.

#### C. Sentencing Challenges

The appellant raises two challenges to his sentence: First, Woods claims that the judge erred in determining his offense level by holding him accountable for four kilograms of cocaine because the government engaged in sentencing factor manipulation; second, he claims that the judge

1003, 140 L.Ed.2d 210 (1998), as applying to issues of Article III subject matter jurisdiction. *See also In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 4 (1st Cir.1999) (referring to Article III's "case or controversy" requirement in finding lack of jurisdiction to reach the merits (citing *Steel Co.*, 523 U.S. at 93–94, 118 S.Ct. 1003)). Because the jurisdictional issue in this case does not implicate Article III, and in the absence of a definitive ruling from the Supreme Court, we will proceed to the merits of Woods's appeal.

improperly denied a two-point deduction under U.S.S.G. § 561.2, known as the safety valve provision.

### 1. Sentencing Factor Manipulation

██ Sentencing factor manipulation, or sentencing entrapment, occurs "when 'a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment.'" *United States v. Staufer*, 38 F.3d 1103, 1106 (9th Cir.1994). We review for clear error the district court's determination that the government did not engage in sentencing factor manipulation. *See United States v. Gibbens*, 25 F.3d 28, 30 (1st Cir.1994).

██ The appellant contends that the government's "bargain basement pricing and generous consignment policy" constitutes sentencing factor manipulation. Appellant Woods's Brief at 28. In other words, Woods argues that his sentence should be based on the two kilograms of cocaine that he originally intended to purchase and not the four kilograms that he was persuaded to purchase when Rocha emphasized the low market price and offered to make the exchange on credit.

In *United States v. Montoya*, 62 F.3d 1 (1st Cir.1995), we acknowledged that a sentencing court can depart from the Guidelines and statutory minimums based on sentencing factor manipulation when the defendant can show that the government engaged in "extraordinary misconduct." *See id.* at 3–5; *see also Gibbens*, 25 F.3d at 31. However, we painstakingly emphasized that "sentencing factor manipulation is a claim only for the extreme and unusual case." *Montoya*, 62 F.3d at 4.

██ Our reasoning in *Montoya* equally applies to the present case and compels the same conclusion that the government did not engage in "undue manipulation":

This case involves a single transaction, not a string of crimes prolonged by the government; the price was within the market range; and the appellants by

their own recorded admissions were well established drug dealers or abetters who had previously dealt in very substantial quantities. As in most stings, this episode began with the government; but as to pressure, there was none, let alone outrageous or intolerable pressure. Nor was there an indication of any illegitimate motive on the part of the agents.

*Id.* The facts of *Montoya* are not distinguishable and thus, our opinion therein controls the outcome in this case. It is evident that Rocha did not pressure the appellants to accept the deal. Woods and Lockhart were eager to receive the additional two kilos on credit and indicated that they would pay Rocha back shortly. As in *Montoya*, the evidence shows that by their own admissions, the appellants were established drug dealers who had previously handled substantial quantities, and furthermore, the appellants expressed their intent to regularly purchase five kilograms from Rocha because they had the customer base. Thus, Woods's reliance on *United States v. Staufer* is misplaced because there the Ninth Circuit emphasized the fact that the defendant "was a user and sometime seller of LSD, but that he sold only to personal friends and had never engaged in a deal even approaching the magnitude of the transaction for which he was convicted." 38 F.3d 1103, 1108; *see also United States v. Naranjo*, 52 F.3d 245, 250–51 (9th Cir.1995) (considering lack of evidence of the defendant's previous drug history). Nor is there any evidence that the credit arrangement was devised to increase the appellants' sentences; to the contrary, Rocha ultimately refused their request to purchase five kilograms. Finally, *Montoya* is not distinguishable, as Woods claims, on the basis that the informant here allegedly was seeking favorable treatment from the government for an incarcerated inmate. The informant's alleged bias bears no relevance whatsoever to the government's conduct. Indeed, the alleged bias only serves to challenge the informant's credibility re-

garding Woods's interest in purchasing a large quantity of cocaine, which is not all that helpful to Woods, when one considers that he, himself, confirmed at the Days Inn meeting that he has a history of large drug transactions. *Compare Naranjo*, 52 F.3d at 250–51 (casting doubt on defendant's predisposition to deal in large quantities of drugs when *only* source for his history in drug trafficking was informant who was attempting to get favorable sentence in connection with his own conviction).

### 2. Safety Valve

■ Likewise, we are not persuaded by the appellant's argument that the district court erred in denying him the benefit of the safety valve provision of the Sentencing Guidelines. *See* U.S.S.G. §§ 5C1.2, 2D1.1(b)(6). The safety valve "permits judicial departures for some low-level, first-time offenders who otherwise would face mandatory minimum sentences." *United States v. Miranda–Santiago*, 96 F.3d 517, 527 (1st Cir.1996). Under the safety valve, a defendant may be sentenced below the mandatory minimum if he meets the five requirements set forth therein. *See id.* at 527. Only the fifth requirement is at issue in this case:

> not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense . . . but the fact that the defendant has no relevant or useful other information to provide . . . shall not preclude a determination by the court that the defendant has complied with this requirement.

U.S.S.G. § 5C1.2.

The district court denied the safety valve request because Woods had not "made a clean breast of things to the government before sentencing." Tr. of June 23, 1998 at 20. The appellant argues, first, that a confession was indeed made at the sentencing hearing; second, that Woods had no further information to provide the government; and, third, that the

government never requested any information. We review for clear error the factual findings underlying the district court's determination that the safety valve was unavailable. *See United States v. Cadavid,* 192 F.3d 230, 239 (1st Cir.1999); *United States v. Scharon,* 187 F.3d 17, 22 (1st Cir.1999).

Whether or not the appellant made a full confession before the district court, it is undisputed that he did not provide the government with information regarding his offense. The district court found, and the record shows, that Woods and Lockhart had previously been involved in drug distribution and had a customer base large enough to handle five kilograms of cocaine per week. Thus, Woods is not a "passive participant" or minor player "who might not know more that [his] designated role suggests." *See Miranda–Santiago*, 96 F.3d at 529. As the government argues, the evidence supports an inference that other players were involved and that Woods "did not disclose information that he might reasonably be expected to possess, nor persuasively explain its absence." *United States v. Montañez*, 82 F.3d 520, 523 (1st Cir.1996). The district court's determination that the appellant was not qualified for the safety valve is not clearly erroneous.

■ While it is true that the safety valve may be available to those who put the government through a trial or wait until the last minute to disclose useful information, *see United States v. Tournier*, 171 F.3d 645, 647 (8th Cir.1999), the safety valve is unavailable to those who have access to information and do not provide it, *see United States v. Wrenn*, 66 F.3d 1, 3 (1st Cir.1995) (observing that the Guidelines contemplate "an affirmative act of cooperation with the government" beyond acceding to allegations during colloquy with the court).

## II. APPELLANT LOCKHART

### A. Sufficiency of the Evidence

■ We can quickly deal with the appellant's weak challenge to the sufficiency of

the evidence. Lockhart contends that a rational jury could not conclude that he knowingly and intentionally conspired and attempted to possess with the intent to distribute cocaine. Examining the record in the light most favorable to the verdict and drawing all reasonable inferences in favor of the government, *see United States v. Reeder*, 170 F.3d 93, 102 (1st Cir.1999); *United States v. Valerio*, 48 F.3d 58, 63 (1st Cir.1995), we find abundant evidence from which a rational jury could infer beyond a reasonable doubt Lockhart's knowledge that he was purchasing cocaine with intent to sell, *see Valerio*, 48 F.3d at 64; *United States v. Akinola*, 985 F.2d 1105, 1109 (1st Cir.1993).

The appellant focuses primarily on the lack of direct contact between Agent Rocha and Lockhart prior to the Days Inn meeting and the absence of a direct reference to cocaine in the recorded transcript of that meeting. First, it is apparent that the appellant relies on the mistaken premise that the government must prove Lockhart's knowledge that the controlled substance at issue was cocaine. That, however, is not the state of the law. We have previously held that the government need only prove that the defendant had knowledge that he was dealing with a controlled substance, not that he had knowledge of the specific controlled substance. *See United States v. Garcia–Rosa*, 876 F.2d 209, 216 (1st Cir.1989); *United States v. Cheung*, 836 F.2d 729, 731 (1st Cir.1988) (citing *United States v. Kairouz*, 751 F.2d 467, 469 (1st Cir.1985) (quoting *United States v. Morales*, 577 F.2d 769, 776 (2d Cir.1978))). We note that the appellant does not even attempt to claim that he was unaware that he was purchasing a controlled substance.

In addition to Rocha's testimony that he specifically mentioned cocaine during the Days Inn meeting—which the jury apparently found credible—the record contains evidence that supports an inference that the appellants were purchasing illicit drugs for distribution. Agent Rocha testified that he called Woods because the informant said she had two people who were interested in buying cocaine. When he called Woods, he specifically said "looking for work," which as he testified is a street code for cocaine. A rational jury could impute this knowledge to Lockhart who showed up for the meeting at a gas station in Providence the next morning with $30,000 in cash. But even more telling, at the Days Inn meeting, the participants discussed the price of "fifteen" as compared to the going rate of "twenty-four" in New York. *See United States v. Perkins*, 926 F.2d 1271, 1282–83 (1st Cir.1991) (explaining that discussion of price range of cocaine indicated knowledge that drugs at issue were cocaine). The appellants expressed their interest in buying "five" kilograms. In Lockhart's presence, Woods asked to try a "sample," to which Rocha responded "It's all wrapped up.... I don't want to cut it up." In addition, Agent Rocha testified that, as a party to the negotiations, he understood that the participants were referring to cocaine.

For similar reasons, so fails Lockhart's argument that his mere presence at the scene is insufficient evidence of his involvement in the crime. *See United States v. Shapiro*, 669 F.2d 593, 595 (9th Cir.1982) (citing *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949)). The record shows that Lockhart was not an unwitting participant in what appears to be a normal drug transaction. *See United States v. Paulino*, 13 F.3d 20, 25 (1st Cir.1994) (citing *United States v. Sepúlveda*, 15 F.3d 1161, 1173 (1st Cir. 1993), for proposition that "a defendant's presence at the point of a drug sale ... can constitute strong evidence of culpability"). Woods introduced Lockhart as his partner. Woods later clarified that Lockhart was actually his source, and that he, Woods, was only the middle man, while Lockhart had the money. Lockhart acknowledged during the meeting that he would "work together" with Woods. He then participated in the negotiations with

Rocha, affirming that "I can buy two right now. I've got the money in the truck.... I've got thirty, thirty grand in the car right now." Furthermore, Lockhart expressed his intent to "make it, you know what I'm saying, a constant thing," telling Rocha he can handle "like five a week," confirming that he had a ready customer base of two hundred. And when the time came, he readily left the room to get the money from his car.

## B. Admissions of Co–Conspirator

The appellant challenges the admission of Rocha's testimony regarding two statements made by Woods during their telephone conversations, namely Woods's statements that he was "looking for work" and that he would be bringing his "partner" to the meeting. The appellant argues first that Woods's statements were inadmissible hearsay because they did not qualify as statements of a co-conspirator made in the course of and in furtherance of the conspiracy under Fed.R.Evid. 801(d)(2)(E); and second, that the admission of Woods's statements was barred by the Confrontation Clause. We disagree on both points.

■■■ Even if, over the government's challenge, we assume that the appellant's objections to the admission of the statements were specific and timely, we review the admission of the testimony for plain error because the appellant did not object to the omission of a *Petrozziello* determination at the close of evidence.[3] *See United States v. Murphy,* 193 F.3d 1, 7–8 & n. 4 (1st Cir.1999); *United States v. Ortiz,* 966 F.2d 707, 715 (1st Cir.1992) (citing *United States v. Perkins,* 926 F.2d 1271, 1283 (1st Cir.1991)).

■■■ As we have already resolved that there was sufficient evidence to sustain the existence of a conspiracy, the only remaining issue is whether there was evidence

that the conspiracy existed at the time of the telephone calls between Rocha and Woods. We need not pause long here, however, because the preponderance of the evidence supports a finding that Woods and Lockhart were already working together when Rocha made the first telephone call. The record shows that Woods referred to his partner and subsequently informed Rocha that he would bring his partner to the meeting. Although Woods did not mention his partner by name, it is a reasonable inference that Lockhart, who accompanied Woods to the meeting, is the same partner to whom Woods referred in the telephone call. Furthermore, in Lockhart's presence, Woods introduced "his partner, Kevin," and the discussion in the hotel room evinces a history of similar transactions on prior occasions. Thus, there was no plain error in admitting Woods's out-of-court statements.

■■■ Because we have determined that Woods's statements qualify as co-conspirator statements under Fed.R.Evid. 801(d)(2)(E), they are not hearsay, and therefore, we can dispose of the Sixth Amendment challenge without further discussion. *See United States v. Saccoccia,* 58 F.3d 754, 779 (1st Cir.1995).

## C. Alleged Spillover Evidence

Finally, we address the appellant's claim that he was prejudiced by alleged "spillover evidence." His argument encompasses vague challenges to the trial court's denial of his motion for severance, made at the close of evidence, and to the failure in the alternative to give the jury a curative instruction to protect the appellant from prejudice from spillover evidence.

■■■ The appellant did not move for severance prior to trial despite notice that Woods would present an entrapment defense, and as a result, we could simply

---

**3.** The proper procedure for admitting or rejecting conspirator statements is to hold a *Petrozziello* determination at the close of evidence. *See United States v. Candelaria–Silva,* 162 F.3d 698, 706–07 (1st Cir.1998) (discussing *United States v. Petrozziello,* 548 F.2d 20, 23 (1st Cir.1977)).

conclude that he had waived his right to pursue it on appeal. *See United States v. LiCausi,* 167 F.3d 36, 44 (1st Cir.1999); *United States v. McLaughlin,* 957 F.2d 12, 18 (1st Cir.1992). To surmount this bar to his claim, the appellant asserts that Woods's late trial decision to change strategies and adopt Lockhart's defense somehow affected the outcome of his case and thus prompted his move for a severance at the close of evidence. Despite a thorough review of the record and the briefs, we are left confused how Woods's last-minute decision to join in Lockhart's defense could have the effect so claimed, when the more obvious inference is that presenting a united front would bolster Lockhart's case. The appellant relies heavily on admissions made during Woods's opening statement, yet readily admits that no objection was made. To justify severance "the antagonism in defenses must be such that if the jury believes one defense, it is compelled to convict the other defendant." *United States v. Angiulo,* 897 F.2d 1169, 1195 (1st Cir.1990) (citing *Drougas,* 748 F.2d at 20). We conclude that such antagonism is not present here since Woods ultimately joined in Lockhart's defense.

The appellant's claim that he was entitled to a curative instruction to prevent prejudice from spillover evidence is just another variation of his challenge to the sufficiency of the evidence, and deserves no further attention from this Court.

### CONCLUSION

For the reasons discussed above, we **affirm** the judgment of conviction as to both appellants and the sentences imposed.